Dennis SWANBERG, et al. *v.* Raymond TART, et al. and Oaklawn Jockey Club, Inc.

89-69 778 S.W.2d 931

Supreme Court of Arkansas
Opinion delivered October 30, 1989

306

*Sanders & Hill, P.A.*, by: *B.W. Sanders* and *Randy L. Hill*, for appellants.

*Paul Bosson*, for appellees Members of Garland County Board of Election commissioners.

*David White*, Hot Springs City Attorney, for appellees Hot Springs City Manager and Board of Directors.

*Friday, Eldredge & Clark*, by: *Herschel H. Friday* and *Kevin A. Crass*, for appellee Oaklawn Jockey Club, Inc.

TOM GLAZE, Justice. This case concerns the Hot Springs election held on March 9, 1989, when the voters approved Sunday racing. Seven days prior to the election, appellants, citizens and

residents of Garland County, filed a petition in circuit court, seeking to invalidate the legislation providing for such election and to enjoin the election. The Garland County Board of Election Commission, the Hot Springs Board of Directors and the Oaklawn Jockey Club, Inc., as intervenors, defended against the appellants' suit. The trial court denied the appellants' request on March 8, 1989, and on that same day, appellants filed their motion in this court requesting we "stay" the March 9 election. We denied that request, and now appellants, raising six points for reversal, ask that we reverse the trial court's decision and set aside the March 9 election results that approved Sunday racing.[1]

First, we mention that this court's denial of the appellants' request to stay the March 9 election was based upon the settled rule that the courts are without authority to enjoin the holding of a regular election, regularly called. *Brown* v. *McDaniel*, 244 Ark. 362, 427 S.W.2d 193 (1968). If a court, trial or appellate, can at the eleventh hour prohibit a regular election, regularly called, it is at once apparent that the control of judges over the election process goes far beyond reasonable limits. *Id.* In *Brown*, the court had four days to consider the taxpayers' request to enjoin the election, and accordingly, it concluded that the best course was to let the election be held, leaving the parties to their post-election remedies. That same procedure was dictated here, since this case was first presented to this court one day before the scheduled election.

This controversy arose from the General Assembly's enactment of Act 12 of 1989, which amended Ark. Code Ann. § 23-110-402 (Supp. 1987) and other related statutes. Section 23-110-402(b) previously empowered the Arkansas Racing Commission to specify racing days on which racing may be conducted, but in doing so, Sundays were excluded. Generally, Act 12 changed the law to permit the franchise holder (Oaklawn Jockey Club) to request the governing body (Hot Springs Board of Directors) to submit the Sunday racing issue to the voters in Hot Springs at a special election. Such an election, under Act 12, is required to be conducted under the general election laws except for the

---

[1] The appellants actually delineate seven points, but their last issue is covered generally in the other arguments made in their brief.

following:

 1. The notice of the election shall be given by the clerk of the city, town or county involved by one publication in a newspaper having general circulation not less than ten days before the election;

 2. the election shall be held no earlier than fifteen days after the date of the adoption of the ordinance in which the election is called by the legislative body;

 3. the mayor of the city shall proclaim the results of the election by issuing the proclamation and publishing it one time in a newspaper having general circulation within the city; and

 4. the results of the election shall be conclusive unless suit is filed in the circuit court within twenty days after the date of the publication of the proclamation.

Act 12 had an emergency clause which, if valid, made the act effective when the Governor signed it on February 3, 1989. On February 21, 1989, the Hot Springs Board of Directors, pursuant to Act 12, passed Ordinance No. 3992 which called a special election on the Sunday racing issue to be held on March 9, 1989. On March 2, 1989, appellants filed their original petition to enjoin the election.

Appellants first contend the March 9 election should be set aside because the time and manner in which it was called violated the absentee voting provisions, particularly Ark. Code Ann. § 7-5-407(a) (1987), of the state election code. In sum, § 7-5-407(a) provides that absentee ballots must be delivered to the county clerk not less than twenty-five days before any election. In the present case, the Hot Springs Board of Directors called the election on February 21, 1989, which was only fifteen days before election day. Appellants' argument must fail.

 To begin, we note the well-settled rule that before an election, the provisions of election laws are mandatory, and after the election, the provisions are directory. *Henley* v. *Goggin*, 241 Ark. 348, 407 S.W.2d 732 (1966). In *Henley*, an action was brought against the Searcy County Board of Election Commissioners about three weeks prior to the November 8, 1966 General

Election to require the commissioner to comply with amendment 51, Arkansas's voter registration law and the state's absentee voting procedures. Recognizing the importance and the mandatory nature of the relief sought, this court advanced the cause for submission and decided its issues prior to the election.

 Here, appellants requested no action to require the Garland County Board of Election Commissioners or the Garland County Clerk to comply with Arkansas's absentee voting laws. Instead, appellants merely asserted the March 9 election should have been enjoined (and now assert set aside) by pointing to the twenty-five day requirement in § 7-5-407(a) and the fifteen days actually allowed due to the date the Hot Springs Board of Directors called the election. Appellants failed at trial, or in this appeal, to name even one voter who was disfranchised by the absentee voting procedure employed at the election. Appellees, on the other hand, introduced testimony at trial by the Garland County Clerk, who said that she was "not aware of anyone being cutoff because of the lateness in arrival of absentee ballots." This court has held many times that elections will not be invalidated for alleged wrongs committed unless those wrongs were such to render the result doubtful. *Lewelling* v. *Mansfield School Dist. No. 76*, 240 Ark. 237, 398 S.W.2d 665 (1966); *see also Allen* v. *Rankin*, 269 Ark. 517, 602 S.W.2d 673 (1980). Here, appellants have wholly failed to show the wrong it asserts in any way caused a doubt in the election results on March 9.[2]

In their second point for reversal, appellants contend that Act 12 is special legislation and violates amendment 14 to the Arkansas Constitution. This court has defined special legislation as follows:

> An act is special if by some inherent limitation or classification it arbitrarily separates some person, place, or thing from those upon which, but for such separation, it would operate, and the legislation is local if it applies to any division or subdivision of the state less than the whole.

---

[2] In their abstract and brief, appellants never mention the results or votes cast in the March 9 election. Appellants also never allege, much less offer proof, that the election officials' failure to comply with the twenty-five day requirement in § 7-5-407(a) could have materially changed the results of the election.

*See, e.g., Owen v. Dalton,* 296 Ark. 351, 757 S.W.2d 921 (1988).

■ Appellants' main argument here is that Act 12 alters the state election laws for the convenience of the Oaklawn Jockey Club and the City of Hot Springs. Such an argument altogether ignores the fact that amendment 46 to the Arkansas Constitution provides that Hot Springs be treated differently by allowing horse racing and pari-mutuel wagering in that city only. If we were to accept the appellants' argument, any legislative act, pertaining to horse racing authorized by amendment 46, would be special legislation.

For much the same reason, we reject appellants' third argument. In this respect, appellants contend that all the voters in the state should have been allowed to vote on the Hot Springs Sunday racing issue. In support of their argument, appellants cite Ark. Code Ann. §§ 23-110-303 and -305 (1987), which provide that the approval of a majority of the qualified electors in the state must authorize the commission's grant of a franchise to conduct horse racing in any county in this state.

■■ Of course, we are not confronted here with the granting of a horse racing franchise which would invoke §§ 23-110-303 and -305. Such a franchise already has been vested, and under amendment 46, the General Assembly is empowered to regulate it. Sections 23-110-303 and -305 simply are not applicable. Amendment 46, itself, contains no language that would prohibit the General Assembly from referring the Sunday racing issue to a vote of the Hot Springs voters, rather than to the voters throughout the state, and we are aware of no other constitutional provisions that would bar the General Assembly.[3] The system of elections was unknown at common law and is a matter governed purely by statute. *See McCoy v. Story,* 243 Ark. 1, 417 S.W.2d 954 (1967). We hold the General Assembly acted within its authority in passing Act 12 and allowing the Hot Springs voters to approve Sunday racing.

■ In point four, appellants argue that Act 12 is an

---

[3] Appellants also claim art. 3, § 2 of the Arkansas Constitution requires a state-wide vote; they fail, however, to offer any convincing argument to support their claim, and we know of none.

unconstitutional attempt by the General Assembly to delegate its legislative authority to regulate racing pursuant to amendment 46. As we have stated and held above, the General Assembly was given the power under amendment 46 to decide the Hot Springs Sunday racing issue; nevertheless, by its enactment of Act 12, the General Assembly decided to allow the voters a voice on the question. This was not a delegation of legislative authority to enact a law. The court has held on prior occasions that the General Assembly can enact a law and provide for operation under it to depend upon a contingency or condition, such as a favorable vote of the electors. *Summers* v. *Road Improvement Dist. No. 16*, 160 Ark. 371, 254 S.W. 696 (1923); *Capps* v. *Judsonia & Steprock Road Improvement Dist.*, 154 Ark. 46, 242 S.W. 72 (1922). In *Capps*, the court espoused the rule that the General Assembly may make a law to delegate the power to determine some facts or state of things, upon which the law makes or intends to make its own action depend. The court amplified by stating the following:

> . . . it is plain that the statute does not amount to a delegation of the legislative power, but on the other hand the Legislature exercised its power by declaring what the law shall be when put into operation in a given locality by ascertainment of certain facts, *i.e.*, the will of the majority in the given locality to be affected.

When viewing the law and circumstances here in the light of the foregoing principles, we are perforced to hold that the General Assembly's enactment of Act 12 delegated the authority to the locality involved to determine a fact, *i.e.*, whether Sunday horse racing should be conducted in Hot Springs. By the same token, the General Assembly retained all aspects of the power and control given it by amendment 46. In sum, we find nothing impermissible regarding the General Assembly's decision to allow the people to vote on the Sunday racing issue.

In appellants' next two points for reversal, they challenge the emergency clauses attached both to Act 12 and Ordinance No. 3992 — the ordinance used to call the March 9 election. Of course, if either was invalid, no authority existed for the call of the March 9 election and the results would be vitiated. We find merit in neither argument.

The emergency clause in Act 12 provides as follows:

It is hereby found and declared that horse racing and activities related thereto in Arkansas have had a most significant favorable impact on the economy of the entire state and the welfare of our citizens and residents, which is threatened by increased competition from racing in other states, including new and improved plants and programs in surrounding and nearby states, and it is imperative that Arkansas franchise holders be able to increase purses and improve facilities in order to keep up with competition and hold and improve Arkansas' premiere and traditional position in horse racing, and that in order to accomplish these goals the amendments and provisions set forth in this act must be effective immediately. Therefore, an emergency is hereby declared to exist and this Act, being immediately necessary for the protection of the public peace, health and safety, shall take effect, and be in full force, immediately upon its passage and approval.

In deciding the validity of an emergency clause, this court in *State* v. *Ziegenbein*, 282 Ark. 162, 666 S.W.2d 698 (1984), set forth the rule as follows:

We do not disturb a finding by the General Assembly that a particular fact comprises an emergency if the fact is recited and if fairminded and intelligent men might reasonably differ as to the sufficiency and truth of the recited fact as a basis for declaring an emergency.

From our analysis of the emergency clause in Act 12, we are unable to say that a fair-minded and intelligent individual might differ with the facts given and recited as necessary for declaring an emergency.

Appellants, with respect to Act 12's emergency clause, also assert that it conflicts with amendment 7 to the Arkansas Constitution by violating the proscription that "an emergency shall not be declared on any franchise or special privilege or act creating any vested right or interest . . . ." The answer to appellants' assertion on this point is simple: the franchise, special privilege or act creating the vested right in Oaklawn Jockey Club, Inc. occurred long before the passage of

Act 12, and the restriction in amendment 7, upon which appellants rely, does not apply.

Concerning appellants' challenge that the emergency clause to Ordinance No. 3992 violated amendment 7, we believe the question raised is best answered in *Chastain* v. *City of Little Rock*, 208 Ark. 142, 185 S.W.2d 95 (1945). There, this court held that an ordinance passed by the Little Rock City Council ordering the annexation of certain territory to be submitted to the voters was not a measure subject to the referendum provisions of amendment 7. The *Chastain* court first noted the rule that the referendum is confined to legislative matters as distinguished from administrative or executive ones. In its opinion, the court set forth the act authorizing the submission of the annexation question to the voters and noted that no formality was prescribed by the act as to the manner the city council must follow in submitting the question. The court stated the following:

> Under this statute it was not necessary that the council pass an ordinance providing for submission of the matter to the voters. It might have been properly done by a motion or resolution, and the determination by the council that the proposal to annex be submitted to the voters, regardless of the form in which this determination was expressed, was not a "legislative proposal or enactment."

In the present situation, the Hot Springs Board of Directors called a special election to submit an issue to its voters and in doing so, was not enacting law. Because the Board's action did not involve a legislative enactment, an emergency clause, as described in amendment 7, was not required.

For the reasons stated above, we affirm.

HICKMAN and PURTLE, JJ., dissent.

DARRELL HICKMAN, Justice, dissenting. I dissent for two reasons. The act in question is an unlawful delegation of the power of the legislature, and the act is local and special in violation of amendment 14 to the Arkansas Constitution.

First, let me express my general agreement with the statements in the majority opinion about enjoining elections. We should not, except in clear and exceptional cases, stop elections.

But neither should we abdicate our responsibility and refuse to set aside an election that is illegal, that is, an election on a question that cannot be the subject of an election. In this case it was an unconstitutional election.

In Justice George Rose Smith's opinion in *Brown & Jenkins v. McDaniel*, 244 Ark. 362, 427 S.W.2d 193 (1968), he touched on this question when he quoted from an Iowa decision:

> The jurisdiction of any court, or of the whole judicial department of the government, to enjoin the expression of the popular will at a time and in the manner provided by statute, may well be doubted. *If the election, when held, was not according to statute, or if the statute was enacted without any constitutional authority, the courts might very well hold the election invalid. . . .* (Italics supplied.)

In *McDaniel*, we were asked four days before the election to set aside a trial court's order prohibiting an election. We allowed the election to proceed on the basis that courts are "without authority to enjoin the holding of a regular election, regularly called." But we did so without prejudice to consider the matter after the election. Standing by that hurried judgment, we explained in an opinion issued later why that principle should be honored. But we are not toothless guardians of the legal process who can never intervene in the election process, and this case presents a prime example of the abuse of the election process. If we cannot sometimes intervene then, the people are powerless to check unconstitutional actions taken by the legislature.

It should be quickly noted that this was not a regular election. Indeed, it was a hurried up affair based on special legislation to allow Sunday racing at the Oaklawn Race Track during the 1989 racing season. While the facts presented and briefs filed may not or could not demonstrate any voter was disenfranchised, none would have been if this election had been ordered or permitted under the existing general election laws of this state. So this was not a regular election, regularly called, entitled to the unusual protection from interference.

We did not prohibit the election because there was no time to consider the numerous and difficult legal issues presented a day or so before the election. We issued no opinion nor any statement of

why we declined to prohibit the election. Not all justices participated in the decision. Consequently, we should not now be prohibited from performing our duty simply because the election is over.

The most difficult question presented is the one on the constitutional principle of delegation of power. In this case the legislature delegated its power to decide what the law is to someone else. The legislature did not decide racing and gambling would be permitted on Sunday. Instead, it chose to delegate that decision to two deeply involved entities: the franchise holder and the electorate of the City of Hot Springs. It is understandable why the legislature did not want to decide horse racing and gambling should be permitted on Sunday. But it could not delegate that tough decision. Amendment 46 to the Arkansas Constitution did not give the power to regulate pari-mutuel gambling to anyone except the legislature. Amendment 46 reads:

> Horse racing and pari-mutuel wagering thereon shall be lawful in Hot Springs, Garland County, Arkansas, and shall be regulated by the General Assembly.

Amendment 46 legalized what is a crime in Arkansas — gambling. The people, no doubt knowing what they were doing, did not want anyone less than their entire representative body to be held responsible for the regulation of this sensitive activity. If the franchise holder or the people of Hot Springs can decide whether there is to be horse racing and gambling on Sunday, then they can decide anything relating to the activity. Surely the people did not intend for the legislature to be able to avoid its duty and responsibility by granting to a few the power to decide what all the state said it would reserve unto itself.

We do not have the question of whether the legislature could have given the Racing Commission the power to decide this question. Such a commission is a creature of the legislature, subject to its control and presumably empowered only to execute legislation; the franchise holder and electorate of Hot Springs are not directly accountable to the legislature nor in any way empowered to execute law.

The majority relies, quite properly I might add, on some old cases which hold that the legislature is not delegating its power

when it gives local people the right to vote on a proposition, thereby finding "facts" and putting into effect a law. These cases, and cases from other jurisdictions, were decided on the principle that it is the law that makes the vote, not the vote that makes the law. *See McLeod* v. *Harvey*, 125 Fla. 742, 170 So. 153 (1936); *Board of Directors* v. *Kelly*, 171 Or. 691, 137 P.2d 295 (1943); *Cincinnati, Wilmington & Zanesville R.R. Co.* v. *Comm'rs of Clinton County*, 1 Ohio St. 77 (1852).

The courts have not always held that way. Some early courts saw clearly what the legislature was doing. In *Barto* v. *Himrod*, 8 N.Y. 483 (1853), the court declared unconstitutional an act which relegated to the people the right to decide if it would "become law." The court made the following statement:

> The legislature had no power to make such submission, nor had the people the power to bind each other by acting upon it. They had voluntarily surrendered that power . . . . The government of this state is democratic; but it is representative democracy.

The court concluded that the practice of having the voters decide whether an act should become law weakened legislative responsibility. *See* L. Jaffe, *An Essay on Delegation of Legislative Power II*, 47 Colum. L. Rev. 561, 562 (1947); *see also Beaumont* v. *Adkisson*, 267 Ark. 511, 593 S.W.2d 11 (1980).

So, while the majority of courts agree with our decision in *Capps* v. *Judsonia & Steprock Road Improvement Co.*, 154 Ark. 46, 242 S.W. 72 (1922), I think they are wrong. It is simply a case of the courts accommodating the legislature. Permitting an election to decide if a law will become effective is simply delegating the power to make law. That is a legislative function, a fact which cannot be changed by even judges. In most cases, the practice is harmless because the delegation is to that group of voters interested or concerned with the legislation, such as an improvement district in a city or county. But what of delegation to a group that does not reflect those affected by the legislation? Are only the residents of Hot Springs concerned with horse racing and gambling on Sunday, or is that a concern of all of Arkansas? The people gave the entire general assembly the power to regulate this activity. Surely it cannot be delegated to the special interests selected in this case.

The act is also special and local legislation in violation of amendment 14 to the Arkansas Constitution. The majority opinion says that all legislation regarding horse racing and gambling in Hot Springs has to be special and local because amendment 46 applies only to the City of Hot Springs.

I hardly think the people of Arkansas meant for all provisions of the Constitution to give way to amendment 46. The people authorized the criminal act of gambling to occur in Hot Springs—they did not mean to suspend the application of all laws in relation to everything that government may do in allowing this activity.

It is undisputed that it is local. This act is special because it involves an election. We have laws on elections, for both general and special elections. Having decided there would be an election, then the election should have conformed to the laws governing all elections. Why should it not? Do electors in Hot Springs have more or less rights than others in the state? This is the very sort of thing amendment 14 was intended to prohibit.

I conclude the election must be voided as illegal.

PURTLE, J., joins in the dissent.